OPINION OF THE COURT
Philip S. Straniere, J.
“Avram: He’s right and he’s right? They both can’t be right.
“Tevye: You know . . . you are also right.”[1]
Plaintiffs, City of New York and the Landmarks Preservation Commission, commenced this action to compel the defendants, Seguine Bay Estates LLC, Leo Tallo and the land and buildings thereon known as 509 Seguine Avenue, also known as block 6666, lot 1 in the County of Richmond, City and State of New York, to comply with the order of the Landmarks Commission issued pursuant to title 25, chapter 3 of the Administrative Code of the City of New York to maintain in good repair *1083 the building known as 509 Seguine Avenue, Staten Island, New York, also known as the Manee-Seguine Homestead.
After a trial on the issues raised in plaintiffs’ complaint and defendants’ answer, the court rendered a written decision dated December 29, 2016 (54 Mise 3d 1204[A], 2016 NY Slip Op 51844[U] [Sup Ct, Richmond County 2016]) in which it determined that the Manee-Seguine Homestead is a structure of historical significance and should be preserved; defendants were each “a person in charge” as defined in Administrative Code of the City of New York § 25-302 (t) and they had failed to maintain the premises as required by the statute (Administrative Code § 25-311) and to comply with the order of Landmarks to do so. The court assessed a penalty of $5,000 a day, the maximum permitted by the statute (Administrative Code § 25-317.1). The total penalty assessed for the period of noncompliance, March 2, 2012 to December 2, 2016, was $8,550,000. To date defendants have not complied with the Landmarks order, nor have the plaintiffs taken any steps to place the premises in good repair. For the period December 2, 2016 to May 2, 2017, an additional $750,000 in penalties have accrued.
The court set a hearing on the issue of whether the statute (Administrative Code § 25-317.1) limited any penalty to the fair market value of the property with or without improvements or if the total fine assessed by the court in its decision is valid.
A hearing was held on March 7 and 8, 2017. Both sides produced expert testimony as to the fair market value of the property.
The statute in question provides:
“§ 25-317.1 Civil penalties.
“a. Any person who violates any provision of sections 25-305, 25-310 or 25-311 or subdivision c of section 25-317 of this chapter or any order ... by the chair with respect to such provisions shall be liable for a civil penalty which may be recovered by the corporation counsel in a civil action in any court of competent jurisdiction. Such civil penalty shall be determined as follows:
“(1) The defendant shall be liable for a civil penalty of up to the fair market value of the improvement parcel, with or without the improvement, whichever is greater . . . .” (Administrative Code § 25-317.1.)
*1084 The court asked each side to produce expert testimony as to the fair market value of the parcel with or without the improvement. As noted by the above quote from “Fiddler on the Roof,” when expert testimony is involved, you may wind up with a situation when both experts are right.
You would also presume that an assignment to opine on the fair market value of the parcel with or without the improvement would be a relatively easy task and although the conclusions may differ, what was being compared would be similar. If that’s what you think, “then you’ve got another think coming.”[2]
Regarding the fair market value of the property with the improvement, the experts compared apples to apples. One may have been using McIntosh and the other Granny Smiths but they were both in the apple family. However, their opinions on the unimproved parcel contained substantial differences between the experts. The court received a comparison between defendants’ apples and plaintiffs’ oranges.
Defendants’ appraisal expert opined as to the value of the parcel without improvements but with all of the existing governmental restrictions, including the landmark designation, still in place. Plaintiffs’ appraisal expert based his opinion on the value of the parcel with the landmark designation having been removed so that the entire 21,000-square-foot lot would be considered vacant land. So as noted by Tevye, perhaps, they both are right.
Both experts rejected the income approach of fixing fair market value as not being applicable. Both experts discounted the C-l commercial overlay as being a viable development option as the parcel is located in a residential area and both believed that the widening of Seguine Avenue to its mapped width had little or no effect on the property value. Both agreed that the landmark designation in this situation rather than enhance the market value of the property actually was a serious detriment. Neither expert took into account the purchase price of the property by defendants in September 2009 of $465,000 nor gave any relevancy to the fact that the Department of Taxation and Finance fixed the market value of the property at $445,000 for fiscal year 2016-2017 as required by Real Property Tax Law § 1200.
Because defendants were challenging the court’s finding and the assessment of the penalty, it was determined that their expert would testify first.
*1085 I. Defendants’ Appraisal Expert
There is a traditional song contained in the Passover Hag-gadah known as “Dayenu.” The Hebrew word translates as “it would have been enough.” The best way to describe defendants’ expert’s testimony is to shout “dayenu”—“it would have been enough”—after each governmental restriction affecting this parcel is explained, leading to a conclusion that taken together the restrictions currently in place are “more than enough” to make the property valueless for appraisal purposes and amount to a taking under the law requiring just compensation to the defendants.
The parcel is now zoned R3X, a residential designation limited to detached one- and two-family houses. This designation is more restrictive than the zoning in place when the property was purchased by the defendants in 2009. An initial plan in 2004 by a prior owner and approved by Landmarks proposing the construction of four attached houses near the corner of Seguine Avenue and Purdy Place is no longer permissible under current zoning and revised flood and wetlands maps. It is irrelevant to any discussion of current development options.
Under R3X there are certain height restrictions for each building. The property also has a commercial overlay which would permit limited commercial development, but both experts rejected this as a potential use. To develop the parcel for residential purposes would require subdividing the property into buildable lots and dealing with the Department of Finance as well as the Department of Buildings. If the parcel was only subject to R3X zoning and compliance with all Department of Buildings requirements, Dayenu.
The parcel is part of the Special South Richmond Development District (SRD), which further restricts development regarding lot size, the number of trees, setbacks from the street, and side and rear yard distances. With this SRD designation in place, the lot size of 21,000 square feet would yield only three or four buildable lots after subdivision. One of the lots would have to be the current structure leaving the balance of the parcel for development. So if three houses could be built for sale, the landmarked building would still have to be renovated to “good repair” at some cost or, if made habitable, at a substantially greater cost. Neither expert opined specifically what would be the reduction in the value of the three potential houses to be built if the boarded up landmark structure is overlooking the new homes. If the parcel was only in the South Richmond District, Dayenu.
*1086 The parcel has an encroachment of wetlands running about 20 feet into the parcel from Purdy Place for the site’s full 167.28 foot length. The New York State Department of Environmental Conservation (DEC) has designated the area as a “wetlands buffer zone with wetlands vegetation.” This means that the property may or may not be developed. To build in or near wetlands approval from the DEC, if not also from federal and city agencies which regulate these environmentally sensitive areas, would be needed. This would affect the soft costs involved in the development of the property and might substantially delay the approval process. The restriction could effectively eliminate 3,300 square feet of the lot from being developed. If the parcel was only in a wetlands buffer zone, Dayenu.
The parcel is located in the HUD Flood Community 360497. The structure is in Zone X while the entire front of the parcel from Purdy Place to the house is considered a VE flood district. This is considered a flood zone with a high risk of storm waves. The expert stated that the flood map used brings the VE flood zone as close as within one inch of the structure. If the homestead itself was subject to flood zone restrictions, it could substantially alter what had to be done to renovate or preserve the structure. If you believe prevailing scientific theories, sea level is rising. If this is accurate, the building could become subject to the flood zone and have additional construction limitations put into place. Post “Super Storm Sandy” flood maps may change the extent of the designation. New FEMA maps were approved in 2013 but have not been adopted by the City further complicating any potential development. If the structure is in a flood zone, it would require flood insurance. The VE designation for the vacant portions of the property requires approval from federal, state and local government to build and may require certain safety restrictions such as raising the height of any building by adding a lower level of non-habitable space in order to raise the living area above the anticipated flood levels. However, raising the height of any proposed buildings to comply with the flood zone restrictions may put such structures in violation of the SRD and R3X maximum height limits. This might entail the developer having to seek a variance from the Department of Buildings. Also at a previous court appearance, representatives of the plaintiffs expressed a concern that any development of the vacant portion of the parcel not block the public’s view of the historic *1087 structure. This Landmarks’ restriction might conflict with development requirements for structures in a flood zone. This is a real issue because the R3X zoning permits only detached houses on the parcel, so any design would have to partially block the street view. At a minimum it would add to the cost and time to develop the property. If the parcel was only a VE flood zone, Dayenu.
As to the structure itself, although neither side did any specific testing as to the materials used on the structure, it would not be surprising to find that the building contains both lead paint and asbestos shingles. In either situation, special environmental regulations would become applicable and would control the removal. If the parcel had only environmental concerns, Dayenu.
Defendants’ expert went on to explain the meaning of the “highest and best use” of the parcel both with the land vacant (without the improvement) and with the existing structure (with the improvement). He differentiated between the three commonly accepted methods used by appraisers to determine fair market value. The income approach was not used because the property generated no rental income. Defendants’ appraiser utilized both the sales comparison approach and the cost approach in analyzing the fair market value of the parcel with and without the improvement.
Comparable Sales Approach
In the defendants’ expert’s opinion, the improved property has a negative market value. Based on comparable sales of four other habitable historic district or landmarked homes sold on Staten Island’s North Shore, between January 2016 and January 2017, the indicated fair market value of the subject property is $550,000. The appraiser accepted the testimony of defendants’ contractor expert, who testified at the original trial, that to return the structure to a habitable condition would be $1,220,000. When deducting the fair market value derived from the comparable sales approach from the estimated cost to renovate, the property has a negative value which results in a “zero dollar” fair market value under the comparable sales approach. The expert took into account all of the governmental regulations currently existing and affecting the property.
Cost Approach
Defendants’ appraisal expert determined that the replacement cost of the residential building shell has a current value of $431,575 and a land value of $179,512 for a total value of *1088 $611,087. He compared this to the estimated cost to renovate the property as a secured shell not in a habitable condition, based on the report of the defendants’ contractor. The contractor previously set the expense to bring to Landmarks’ “good repair” standard at $700,000. Because the cost of renovation exceeds the replacement cost and land value by $88,000, the expert concluded the value under a cost approach is also “zero dollars.” In using this approach the expert valued the land with all its governmental restrictions as “undevelopable” because whether the structure is present or not, the parcel is landmarked and subject to all the governmental restrictions cited above. To get the value of the land only, the expert located three vacant undevelopable parcels in flood areas and two of which are also in wetland areas. These sales were made between 2008 and 2013.
The defendants’ expert did not value the property as vacant land without the landmark designation because that is a restriction currently in place and would have to be removed by going through a process to do so and which may or may not be granted. It was conceded that if the landmarked building was demolished the designation should be removed because the vacant land is not landmarked. In this circumstance, all the other governmental restrictions would be in place except that of the landmark status. In this case, it is the building which is of significance and required the landmark designation.
II. Defendants’ Architectural Expert
Defendants also produced an architect to testify as an expert. His testimony was consistent with that of defendants’ appraiser regarding the numerous various governmental restrictions affecting the property. He expressed concern about the flood zone noting that the flood maps are being adjusted by FEMA and although the structure appears currently to be just barely outside the flood zone, the expert opined that if it were in a flood zone the building would have to be raised 15 feet, a costly endeavor owing to the age and condition of the structure. And in that vein, to have to raise the structure so as to meet the current flood zone regulation would defeat the spirit of preserving the landmarked qualities of the building.
In regard to the wetlands designation, he stated, even though only part of the parcel is designated wetlands, the remainder of the lot is a “check zone” meaning that a botanist might be required to conduct a vegetation survey to determine if there *1089 are protected plants growing outside the wetlands area. This could raise the development costs and may also remove square footage from the developable area.
His belief was because the property is in the SRD with side yard and tree requirements, at most only two additional detached houses could he built. Commenting on plaintiffs’ expert’s suggestion that the existing structure could be used for a restaurant or nursery school, he opined that fire walls, sprinkler systems and other safety devices would have to be installed substantially increasing the development costs. And again, such a plan would fly in the face of preserving the land-marked qualities of the building.
In the architect’s opinion, the approval process to develop the property with its current restrictions would take at least three years and would require “soft costs” of between $60,000 and $150,000.
III. Plaintiffs’ Appraisal Expert
If there is a song that comes to mind after listening to the testimony of plaintiffs’ appraisal expert and reviewing his written report, it would be “High Hopes” by Jimmy Van Heusen and Sammy Cahn. You know the one that goes:
“But he has high hopes, he’s got high hopes
“He’s got high apple pie in the sky hopes . . .
“All problems just a toy balloon
“They’ll be bursting soon
“They’re just bound to go pop
“Oops there goes another problem kerplop.”
According to plaintiffs’ expert, the property is capable of development and although subject to all of these governmental restrictions, a fair return on investment may be derived by the owner. This can be achieved whether “the moon is in the Seventh House and Jupiter aligns with Mars”[3] or not.
Plaintiffs’ expert rendered his opinion of the “highest and best use” as an improved parcel with the landmark in place and as vacant land without the landmark status. The latter analysis differs from that of the defendants’ expert who treated the parcel as vacant but with the landmark designation still in place.
*1090 Plaintiffs’ expert assumed that for a vacant land analysis the structure has been demolished and the property would be developed consistent with current zoning, SRD, wetlands and flood zone restrictions. In this scenario he believes three or four one- or two-family houses could be built. However, the expert noted because the front portion of the property is in a VE flood zone, any construction would have to be two feet above the base flood elevation. If the lower floor is considered a “story” only three houses could be built; if not considered a story, then four units could be developed. He included a photograph of a new house being constructed on Purdy Place as an example of the style that would be required to comply with flood zone requirements.
Plaintiffs’ expert rejected the cost approach because it is “best suited for new structures.” He opined that neither he nor any appraiser could accurately estimate the reproduction cost for a landmarked structure. In order to render his opinion as to the value of the subject property based on comparable sales, he located eight recent sales of vacant parcels or lots on some of which there was a structure demolished in order to build a new one. None of these parcels have a landmark designation.
There is a problem with the comparable parcels he selected. None are below Hylan Boulevard or in a flood zone and none are wetlands or adjacent to wetlands. Why is this important? Native Staten Islanders know you do not buy land or build “below the Boulevard” because it floods. In fact, when Henry Hudson sailed into New York Harbor in 1609 on the Half Moon he sent some of his crew members ashore to Staten Island to speak to the Lenni Lenape Indians inhabiting the place. They told Hudson the same thing: “Don’t build a settlement below what will be Hylan Boulevard in 300 years. It floods.”
Another difference is that all but one of the comparable sales are on relatively flat lots, while 509 Seguine Avenue is sloped. The expert conceded that sloping may increase development costs.
In his opinion the “market value” of the property as vacant land without the landmark designation is $1,130,000. But of what value is his opinion when his comparable properties are not really “comparable”? The court understands that appraisers make adjustments for such differences, but perhaps a greater effort should have been put into locating more similar properties. For instance, in a case involving condemnation of property designated as wetlands, the court made a finding that *1091 a 19,500-square-foot parcel of vacant land on Staten Island had a value of $810,000 in 2012 (Matter of New Cr. Bluebelt, Phase 4., 122 AD3d 859 [2014]).
Plaintiffs’ expert also rendered an opinion as to the value of the property with the landmark structure remaining in place. To do this he used that same comparable sales that he used for the market value as vacant land. In reaching his opinion he gave no value to the landmarked structure and appraised the value of the remainder of the vacant land portion of the parcel. He concluded that the market value of the property would be $652,000. This figure is for the approximately 10,344 buildable square feet of the parcel; a figure less than one half of the total lot size. He gave absolutely no value to the landmarked structure. He assumed that a buyer of the property would leave the structure vacant and only invest the minimal amount of money to meet Landmarks Commission standards. Plaintiffs’ appraiser rendered no opinion as to what the cost would be to restore the structure to a habitable condition. He attached to his report an estimate produced by DACK for the plaintiff on February 26, 2017 setting the minimum repair cost at $245,100.
The defendants objected to the introduction of the DACK report because they would not have the opportunity to cross-examine the author of it. Defendants asserted that their engineers and experts were questioned about their reports by the plaintiffs at the initial trial. It should be noted that at the original trial, plaintiffs produced several engineering reports and the testimony of experts in that regard concerning the measures necessary to be undertaken to ensure that the structure was secured to Landmarks’ standards. None of those reports placed a cost on securing the property. One of the plaintiffs’ experts indicated he thought repairs should not exceed $100,000.
Carrying this expert’s opinion to a logical conclusion would mean that half the property is valueless from a market value perspective and that unmarketable portion would require about $250,000 in repairs just to bring the structure to Landmarks’ “good repair” status. This would then reduce the value of the developable portion to about $400,000. Of course, if the defendants’ estimate of $700,000 to restore the structure is accurate, the entire parcel would have a negative value, the conclusion reached by defendants’ appraisal expert.
Of course, the actual cost of securing the property to Landmarks’ standards would be known if the plaintiffs had *1092 exercised their right to do so as provided by the statute, when the defendants failed to act. The court had suggested that the plaintiffs invoke this procedure on several occasions over the time of this litigation. The suggestion was not followed by the plaintiffs for some unstated reason other than maintenance of the premises was the defendants’ responsibility in the first instance.
The numerous problems with the plaintiffs’ expert’s assumptions in making his report cast serious doubt on its conclusions.
IV. Determination as to Value
As noted at the start of this decision, the court must reconcile two disparate findings as to the value of the parcel because the appraisers each operated under different assumptions. Not unexpectedly, the assumptions tend to favor the position of their respective clients. A butcher can take meat, spices and other stuff and grind it up and get either Italian sweet sausage or Polish kielbasa depending on what goes into the mix. In this case, it appears we may have wound up with two different sausages when we would be better served by one of “Mrs. Lovett’s Meat Pies.”[4]
Even though they relied on different metrics in reaching their respective opinions, one thing is clear, that the current dilapidated landmarked structure is a detriment to the fair market value of the property. As both experts noted, the most likely purchaser of a property such as this is a preservationist or the government. The only conclusion that can be reached is that the existence of the landmark designation, along with the other governmental restrictions from various agencies makes the property undevelopable for an investor such as the defendants herein or any other good faith purchaser in an arm’s length transaction except a preservationist.
This being the case, the fair market value so long as the landmarked structure exists and its designation remains is zero. The question remains, however, is that the standard to be applied in determining if the $8,550,000 penalty the court assessed is reasonable.
The optimism expressed by plaintiffs’ expert that the property is developable is not reasonable. Perhaps plaintiffs would *1093 prevail “in the best of all possible worlds.”[5] But that is not what exists in this fact situation. The permit process through the numerous governmental agencies overseeing this parcel, which any owner would have to go through, makes the cost of developing the property consistent with current zoning by a non-preservationist not economically feasible. Whether this amounts to a taking which requires the compensation of the owner by the City of New York will be addressed later in this decision.
Of course, in a rational universe, once a property was land-marked, the Landmarks Commission would have the professional staff in-house to approve development and not require the owner to have to bounce from agency to agency for approvals like a pinball without the skill of “Tommy-The Pin Ball Wizard.”[6] Anyone seeking development of a parcel such as this faces the very real possibility of obtaining approval from one agency then going to the next one, which would require the plans to be changed to that agency’s satisfaction, and then because of the second agency’s changes, start the process all over again like some modern-day Sisyphus.[7]
Accepting the wisdom of Tevye that both appraisers are “right” in that they operated in good faith and within the standards established for appraisals, the court can make a determination as to a market value of the property in its current condition. Plaintiffs’ expert fixed the property at $652,000 without deducting the cost of securing the premises to meet Landmarks’ concerns while the defendants’ appraiser set the figure at $550,000 but opined the cost to secure the structure exceeded that value rendering the property valueless for appraisal purposes. Because they are estimates the court is taking an average of the two expert’s opinions and fixing the fair market value of the property at $601,000 irrespective of the need to renovate the premises to preserve them for Landmarks’ purpose or to render it as habitable. The court believes that the property does not have a fair market value with the landmark status and the other restrictions because it does not believe that there is a ready, willing and able buyer for the property.
*1094 Because the property has no value from an appraisal standpoint, if the court would accept that as binding, there would be no fine assessed pursuant to Administrative Code § 25-317.1 in its current state with the improvement. It is highly improbable that any parcel of real property is completely “worthless,” absent it being burdened with mortgages and/or liens, which is not the case in this instance as there are no financial encumbrances other than the penalty imposed in this litigation. It cannot be the law that because the property has no fair market value no fine may be imposed.
The court cannot make a finding as to the fair market value of the property without the improvement because both appraisers have defects in their methodology which render their findings insufficient. Plaintiffs’ expert used as comparable sales properties not subject to the restrictions of being a wetlands buffer or in a flood zone. He fixed the property at $1,130,000 after demolition. Defendants’ expert sought properties with similar restrictions; however, the comparable sales were too long ago in time. He fixed the land value at about $180,000 but with the structure still in place. Assuming the structure utilizes 25% of the land, if it were gone the property alone would be $240,000 but with most of it except for the footprint of the structure being in a flood zone. Again, as both are estimates, and to a degree are apples and oranges, averaging the two figures, the value of the land without improvements would be $685,000. However, this would be a “SWAG”—a scientific wild ass guess.
The court is on the horns of a dilemma. If it accepts the defendants’ appraiser’s position the property has no fair market value as it is not financially feasible to develop with the current restrictions attached to it. This would lead to having no fine assessed. If the court accepts the plaintiffs’ appraiser’s opinion, then the property has value, but the value he asserts is devoid of reality in that it promotes an unrealistic development scheme.
This leads to the conclusion that the statute as drafted is defective in that it fails to address the situation that exists here where the owner of the landmarked premises operates in a manner so as to incur fines in excess of the fair market value with or without the improvement. To allow defendants to limit their liability in this manner would make a travesty of the intent of the statute. The solution is to hold that the fine of $8,550,000 is reasonable and enforceable; however, it can only *1095 be satisfied from the property itself. The defendants may want to go through the development process for the parcel, obtain all the approvals and then forfeit all revenue derived to the plaintiffs to satisfy the penalty. This is not a likely scenario but one that would prevent them from benefitting from their own failure to avail themselves of the procedures set forth in the statutory scheme.
But in some sense, the actual numbers derived from the experts are irrelevant because none of them exceed the amount of the penalty assessed for noncompliance with the Landmarks order. No matter which appraisal is used the fine is greater than the market value. The statute limits the penalty to the value of the property. The only way to satisfy the statute is for the defendants to convey title to the plaintiffs. The $8,550,000 fine is valid. Even if the court were to reduce the fine to $500 a day, something it is not inclined to do, the fine would approach a million dollars to date and still be in excess of the fair market value.
Defendants may convey title to the property to the plaintiffs by August 1, 2017 in full satisfaction of their obligation to the plaintiffs for violating the statute in regard to maintaining the property.
V. Has there been a taking?
The right of a property owner to “just compensation” when the government seeks to acquire that property for a public purpose is protected by the US Constitution’s Fifth and Fourteenth Amendments and article I, § 7 of the New York State Constitution.
The issue of whether designating a parcel of privately owned property a landmark is a “taking” requiring “just compensation” under the Fifth and Fourteenth Amendments to the US Constitution has been decided. It is not (Penn Central Transp. Co. v New York City, 438 US 104 [1978]). Likewise, each of the individual governmental restrictions affecting the property, zoning, special district, wetlands and flood, have all been found to be proper use of the police power and generally do not give rise to right to compensation. The facts in this litigation are different because all of these regulations affect the property at the same time. There is case law that has found a regulatory taking has occurred when a single regulation goes too far (Lingle v Chevron U. S. A. Inc., 544 US 528 [2005]). Although each of the regulations affecting the property have in litigation *1096 been found not to be takings, the issue here is while one of them might not be sufficient to constitute a taking, what is the aggregate effect of them on defendants’ rights?
The answer is clear that based on the testimony of both experts that the existence of these numerous regulations either make the property unmarketable to a good faith purchaser if defendants want to try to sell it or not financially feasible to develop it in a manner to generate a reasonable return on their investment when the cost of having to comply with all of these regulatory agencies and their often contradictory rules are taken into account. It must be concluded that the property is unsellable and undevelopable.
The regulations, when taken together, deny the defendants of all economically viable use of the land and qualifies as one of the categories of regulatory deprivations that require compensation without case-specific inquiry into the public interest advanced in support of each restraint (Lucas v South Carolina Coastal Council, 505 US 1003 [1992]).
The facts of this case with the zoning, wetlands, and flood regulations in place, existing with the overlay of the landmark designation, preclude any use of the property for which it is reasonably adapted other than that as a landmark {Matter of New Cr. Bluehelt, Phase 4.). The plaintiffs’ expert’s assertion that the structure could be rehabilitated as either a restaurant or nursery school would require an outlay of monies far in excess of those to restore it as a habitable residence and would require compliance with more governmental regulations such as the Health Department and the Americans with Disabilities Act.
The only use of this property as it currently exists and subject to the regulations in place is as an historic/landmark site. The Manee-Seguine Homestead is the Salem Witch Trials’ Giles Corey of land, crushed by regulations. Or to put in wrestling vernacular, if the conglomerate of regulations were 603 pound Haystacks Calhoun and the property an opponent, the Manee-Seguine Homestead finds itself under Calhoun’s “Big Splash” move. “It ain’t gettin’ up.” It has a value to the public for its landmarked purpose. The defendants purchased it with the eyes of a developer seeking to maximize an investment and not as a philanthropist. They should not be forced into that position because of governmental regulations.
The existence of all the regulations and restrictions constitute a taking under New York and federal law entitling the de *1097 fendants to just compensation. In addition, the judgment levied against the defendants for failing to comply with the law is also a lien on the property adversely affecting its market value and impacting the likelihood of finding an arm’s length purchaser for value. The defendants have failed to properly comply with the reasonable regulations of the Landmarks Commission and have incurred penalties far in excess of the value of the property no matter which appraisal has been used. The defendants have by their conduct lost the right to any compensation and created a situation where the property is forfeited to the City of New York in full satisfaction of the judgment.
Conclusion
The penalty assessed by this court is valid and in full force and effect. The value of the property both with or without the improvement no matter what appraisal is used is substantially less than the amount of the penalty. The property is forfeited to the plaintiffs in full satisfaction of the judgment. Defendants are to execute a deed and all documents required to convey and record title by August 1, 2017.

. Joseph Stein, Fiddler on the Roof, music by Jerry Bock, lyrics by Sheldon Harnick.

. American colloquial phrase of unknown origin.

. Galt MacDermot, James Rado and Gerome Ragni, “Aquarius/Let the Sunshine In,” from Hair.

. As seen in Hugh Wheeler, Sweeney Todd, music and lyrics by Stephen Sondheim.

. Voltaire (Francois Marie Arouet), Candide, ou I’Optimisme (1759).

. The Who, Peter Townshend, “Tommy.”

. Sisyphus, King of Ehpyra in Greek mythology, was condemned to roll a rock up a hill only to see it roll back down and have to start again.